Good morning, everyone. We have five cases on this morning's argument calendar, and we'll begin with Appeal No. 223140, the United States v. Thomas Osadzinski. Mr. Herman, nice to see you. Good morning. Good morning, Judge Scudder, Judge Wood, Judge Dainese. May it please the Court. My name is Josh Herman, and I am here on behalf of Defendant Appellant Thomas Osadzinski. This is a unique and important case with significant First Amendment consequences. Mr. Osadzinski was a 20-year-old junior at DePaul University when he was arrested in November of 2019 and eventually charged and then subsequently convicted after a jury trial of attempting to provide material support to ISIS in the form of terrorist organization in violation of 18 U.S.C. 2339b. However, Mr. Osadzinski did not commit or attempt to commit any act of violence. He did not attempt to travel overseas or actually travel overseas. He did not send money or try to send money to ISIS, and quite to the contrary, as established in the record, when given multiple opportunities by undercover government operatives to do something for ISIS, such as translations or sending screenshots of the computer script, he denied, he demurred, he delayed, and he ultimately ignored. So, Mr. Herman, what he seems to have done, but please correct me if I'm not reading the record right, is he seems to have written this code designed to thwart efforts to take down ISIS messages, that if it was taken down, this thing somehow propagated the item that was taken down and brought it back out, and that ISIS itself had called for measures to thwart these takedown efforts. It was part of its international, I guess, presence. I'm not sure whether it was recruitment or just information. So, do I understand your position is just writing this computer code alone was not enough to constitute an attempt at material assistance? Yes, Judge, and there's a lot to impact there, and I'm I think it touches on both our First Amendment vagueness arguments, also the due process as applied, and it bleeds into the sufficiency arguments as well. But if I can clarify one point, a couple of points about this code. So, we're talking in a trial, it was called the NASP, N-A-S dot P-Y. It's a code in the Python computer language, and he did not actually write the code. The code was out in the universe. There was a stipulation that the parties entered into. He created the program, though, didn't he? No. With the code? No, Your Honor, he made slight modifications to it, which was the best the evidence, I think, at trial established that there was another individual aptly named No-Name that the government never identified and never, more importantly, never said was a member of ISIS. What about his own statements that he had created it? Those statements, there were a lot of statements from Mr. Ozyzynski that I think we can chalk up to blusters, such as my favorite weapon is a Kalashnikov when he had never touched a gun before. But certainly from the sufficiency of the evidence point, and that we're looking at things in the light most favorable to the government, I don't think we could chalk it up to that. Well, from the sufficiency of the evidence, I think that the more important question is whether or not there was an attempt to act under the direction or in coordination with ISIS as opposed to operating the code. Somebody could take this code and send it along directly to ISIS, and even if they had not authored it, that perhaps could be evidence that would weigh in the government's sufficiency side. The more important point is the direction and coordination element. And to Judge Wood's point in, you know, what is the argument here from a First Amendment perspective, if you would even use this code, and this is where I want to be very clear about what the code actually did. The code copied and forwarded ISIS videos from one private telegram channel to another private telegram channel. So we are not talking about distribution to the general public. We are not talking about content creation. We are talking very narrowly about copying between private telegram channels. And just to be sure we're on the same page, telegram is a social media application, and a channel could be essentially a private chat group. You could have one person in there, you could have multiple people in there. And we saw from the evidence at the undercover online covert employee known as OCE4. But the key issue from a First Amendment perspective here, which we focus on, and which is why I began with talking about this is a case of First Amendment consequence, is that the direction and coordination theory here is essentially that once ISIS says support us online, or any FTO, if somebody does any type of act to then express advocacy or support for ISIS or any foreign terrorist organization online subsequent to that call, it eliminates the right to engage in any type of independent advocacy. I was going to say, so I think you're touching on the language from the Boehm case about how people can say, I love ISIS, or they can say, I'm a supporter of ISIS, as long as all they're doing is talking and but I want to make sure, again, I want to understand your argument. I thought that to accept your argument, it was necessary to accept that ISIS couldn't act through an intermediary. I think everybody agrees OCEs 1 through 4 were not, he didn't even think they were ISIS people, he thought they were fellow travelers, but he thought they were communicating ISIS's views. So I saw it as an agency issue. I saw it as, is it impossible in your view for ISIS to act through an intermediary? No, and I think that's an important point of distinction when we look at other material support cases, some from this circuit, but mainly from other circuits. Typically you would find in a material support case, in the 2339B case, a government agent posing as somebody who has a direct conduit to ISIS, and we saw that here with, in multiple occasions with OCE 1, or I believe OCE 3 saying, I have this two-page translation, and I'm going to, from Arabic for bomb making instructions, can you translate it to English and provide it to ISIS? OCE 4 said, send me screenshots so I can send them to ISIS, and Mr. Ozyzynski didn't follow through with either of those, and it's not necessarily just the Boehm case, which actually predates and foreshadowed, more importantly, the Humanitarian Law Project case, which then requires- Does it matter, and I'm sorry to interrupt you, you can incorporate it in, does it matter though that this was charged as an attempt? That's, it actually, a very, this, the attempt charge in this case, your honor, post a bit of a conundrum here, especially when we see that the government in its brief here, towards the end in a footnote, says he actually did provide material support, and I think this gets to the nut of the vagueness in our due process arguments about when does one attempt to provide advocacy in support of a foreign terrorist organization? Where did the attempt occur here? It looks to us more, not like an incohate offense, but he actually, under the government's theory, he actually provided material support by advocating in support of ISIS and simply copying and forwarding videos. But we don't have to find that, or rely on that, since he was convicted of attempt, correct? He was convicted of attempt, but that again begs the question of how can an attempt to provide independent advocacy exist when there is a right to independent advocacy? And I think this is a point I think the ACLU, the ACLU has made, and I think the ACLU has made through a sentence supporting ISIS, forwarding a video to somebody, and the video is never seen, like the tree falling in the forest. The attempt cases don't fit in a case where you're not dealing with a fungible good or fungible training, such as in the humanitarian law project. We're talking about fungibility. Advocacy is not fungibility, and this is a point I think the ACLU makes very, very well in its amicus brief here. We are not talking about the core concerns that were in HLP, where we are dealing with plaintiffs who are speaking directly in a pre-enforcement action to the PKK and the LTTE, two foreign terrorist organizations, seeking to provide them with and potentially obtain weapons. That was the nut of the concern. Mr. Herman, can I take you back to a little bit of a strand of what Judge Wood was asking you about? And that is, I totally understand, and I think you do quite a good job in your brief at expressing a concern with the statute being used to prosecute individuals that just, you know, generally respond to a call to continue a propaganda campaign or to articulate support for an organization, where I have difficulty, and I totally get that. It's a hard line-drawing question in this area. What I wonder about, though, is does it break down for you factually here? And the reason is because, in keeping with Judge Wood's observation, it seems to me, these are my words, not anybody else's, okay, that the defendant kind of self-deputized himself as a member of the ISIS media organization, as a member of the Dewan, in an effort to help the organization stay ahead of efforts by Western governments, including the United States, to shut down ISIS propaganda. And that's what his script was designed to do, to kind of help, so the nexus seems tighter than the concern, the nexus factually seems tighter than the concern that you articulated in your brief. How is that view mistaken? Sure. So we're getting more into the sufficiency side of things, and I'll hit the points as quickly as I can to save time for rebuttal. He did not self-deputize himself as a part of the Dewan. He identified himself as a supporter. The word that he used was Munasir, M-U-N-A-S-I-R, not an actual member of ISIS. The direction, again, from the government's theory was this video called Inside Eight, which was to support us online. This was one of thousands of videos that he had while he made some comments about seeing it. But not generally support, right? Support in a way to stay ahead of these efforts that are taking down, or as Judge Wood put it, thwarting the organization's media campaign. Right. So that in itself, if you go back to the other service, and I think, again, focus on the services that were here, we were talking about looking specifically at the document called I'm not sure I'm going to correctly quote your honor, but when you said he took it upon himself. That is, in essence, independent action. And independent action, according to HLP, even if independent action and advocacy has some type of, confer some type of benefit to the foreign terrorist organization, is still legal. So somebody could, even if ISIS said, we want everybody in the world to see our videos, somebody could say, independently take it upon themselves to spread those videos and those messages. If I haven't answered your question fully, I don't know. You haven't. We'll give you don't. We're going to give you a rebuttal time. Okay. So keep going. And again, this document called Heralds of the Internet, it was the government that described it as a manifesto. It was a personal statement with a personal intent in the beginning of his own particular viewpoint. We may find that viewpoint completely disagreeable. But as the ACLU said in its brief, in which we echo, this court has an honored history of protecting disfavored viewpoints in light of the First Amendment. With the government's theory here, and this is in the closing rebuttal argument at page 1422, there's two poles, according to the government. You can be completely isolated from an FTO and then say whatever you want. Or it's you're working under direction and in coordination with it. But that's not the law and it's impossible to be completely isolated because it punishes those who exercise an inherent First Amendment. But given the jury instructions here, the jury could not have convicted based on the isolation theory because the jury instructions were very clear that this had to be done at the direction of and in coordination with ISIS. We submit that this is a case that should not have gone to the jury and the Rule 29 should have been granted because the theory in and of itself allowed for Mr. O. Zizinsky to be convicted based on First Amendment conduct, based on a theory that where direction is derived from the exercise of First Amendment rights and the theory nullifies the existence of independent advocacy. I'd like to reserve the Can I ask you one more question? We'll give you a rebuttal time. Can you help me just step back one second? One aspect of your appeal, if I understand it, is there's three issues that you've put in front of us. You've got the Fifth Amendment void for vagueness. You've got the straight up sufficiency of evidence challenge. And then kind of in between there you have an argument that the conviction offends the free speech clause of the First Amendment. Is that a strand of the sufficiency of evidence challenge or is it something distinct? I think it's distinct but I recognize how it can bleed into it because as any as applied challenge you have to look at the facts and Judge Gettleman in his Rule 29 ruling basically said I've looked at the facts, I've heard the facts after sitting through the trial. That's exactly the point. If it's not like a subsection or a separate aspect of the sufficiency of evidence challenge, what I was confused about in preparing for this is how do you conduct judicial review of it? And the reason I'm asking that question is because your brief very much seems to focus not only on the pre-trial ruling, Judge Gettleman wrote an order, wrote an opinion denying the challenge or denying the motion to dismiss the indictment, but you also seem to focus on what happened at trial and therefore you have an evidentiary focus. Correct. We think the issues should be parsed out where the First Amendment argument, even if you accept the government's theory, even if you accept all of the facts, even if you accept that he listened to ISIS saying we want other people to see our video. So is that to say then that we should, yes we can go ahead and invoke the standard of review that ordinarily applies to sufficiency challenges and we just ought to ask a precise question here. Could a rational jury have concluded that a violation of this statute did not offend his free speech rights? Is that the right question to ask however it comes out? I think the right question is using the standard of de novo review for a First Amendment challenge here which is whether or not accepting, just accepting the facts as true that there was, can direction derive from a call from a foreign terrorist organization to others to support it online? Can there be, so the issue in a nutshell from this case and why we think it is a truly important First Amendment case is whether or not there is a right to independent advocacy in the digital age because FTO propaganda is ubiquitous. We noted in footnote one of our- So you want us to just, you want us to, you may be right, I mean I think it's a tricky little question. Just conduct a review of the theory of prosecution as applied. Correct. And then we have again the sufficiency evidence on the back end and in between, I think the in between argument is the notice argument. Okay, we'll give you your rebuttal time. We'll hear from the government. Good morning and may it please the court. Melody Wells for the United States. The Supreme Court has upheld the constitutionality of section 2339b in the face of defendants challenges, specifically humanitarian law project held that services is not impermissibly vague. It also held that while the First Amendment protects independent advocacy, it does not protect conduct or speech that is done at the direction of a foreign terrorist organization like ISIS. A properly instructed jury found that defendant was no independent advocate, finding instead that he acted at ISIS's direction and they did so based on ample evidence that on government. That evidence showed that ISIS directed supporters like defendant to assist it in keeping ISIS accounts and information online and social media applications were removing terrorist content. Ms. Wells, where's the line on direction and control? How much does there have to be? Because the argument is these general calls through videos and other media apps really can never amount to direction or control. Your Honor, the government disagrees. Defendant would have us look at this as an all or nothing proposition, that it cannot be a public request and that that cannot amount to direction and control. But what the defendant attempts to do is to excise everything that happened in between ISIS issuing this directive through, for example, the Inside 8 video, which the government of course acknowledges was a public directive. That's the way these organizations like ISIS operate. You didn't put the full video in the record, is that correct? That's correct, Your Honor. The government, both on its own and in response to defendant's objections, did not put in images of violence. Inside 8 contained those types of images. We admitted clips that contained the relevant portions to the directives. There is some limited testimony from witnesses about the kind of violent imagery that appeared in some of these videos, but we did not show that type of information to the jury. And no one is contesting the standalone accuracy or legitimacy of what you did put in? I'm assuming the rule of completeness and things like that, you know, it... No, Your Honor. None of that was challenged. And again, this was really to address objections made by the defense team and concerns that the court raised and of course the government's, you know, concern with putting that kind of information before the jury. There's no challenge to the completeness of this record in that way at all, Your Honor. Can I stay with that question? Were the clips of Inside 8 and the other one was what, structure of the Khalifa? Yes, those were two of the videos. Okay. Were the clips, are the clips part of the evidentiary record even if the full videos are not? Yes, the clips are part of the evidentiary record. We've sent those up and they're available to the court as well for consideration. Okay. They're actually not. I believe you that they're part of the trial record. You know that better than I would, but we can't access them. I looked for them. I tried. They're not on the record that was transmitted to our court. Your Honor, I will check on that. It is my recollection that they were included in our motion to supplement the record with the district court. I will investigate why those clips were not made available. That order was granted in full and I'll see what happens. Yeah, perhaps you can work, just if you can work with Mr. Herman, I mean there, there's a lot of issues that are contested but hopefully we're not disagreeing about what the evidence was that was before the jury. Then we can argue about what it means and all that. It is not my understanding and I'll defer to Mr. Herman that there's any disagreement about the evidence itself. But turning back to Judge Saineev's question, one thing that the defendant attempts to do is to take out everything that happened between this video existing and the fact that he saw it and his creation of this computer program when in fact the evidence shows that he knew about the directive, he talked about it, he shared it with others, he sent screenshots to people that he believed were working for ISIS. So why does that all add up to accepting direction from them? You can know about all sorts of things and if you were just standing on the street corner over at the Federal Plaza handing out pamphlets that said these things, wouldn't you agree that that's simply a way of exercising your First Amendment rights? A person is entitled to stand on the street corner outside any building in the United States and hand out pamphlets, Your Honor. That would not be standing alone any evidence of a crime. Even if the is one that says we hope people will take every possible step to disseminate our message. That is correct, Your Honor. But as Humanitarian Law Project pointed out, there is a difference between advocating for a cause and providing a service to an organization that advocates for the same cause. Doesn't that skip over the question though of the first directive or any subsequent directive? How specific that directive needs to be? Because you said, well here's the directive and then he did all these other things. But isn't the question on the line drawing, how specific does that directive have to be in the first place in order to qualify for services? Your Honor, I think that Humanitarian Law Project holds that someone needs to act at the direction of or in coordination with an FTO. Which I don't think answers the question of how specific does that directive or requested coordination need to be. The ordinary understanding of a directive would be a command or an instruction by another person or entity. I'm not aware. To do what though? I think that's what Judge St. Eve is getting at. If all ISIS said was we hope as many people in the world as possible will support us, surely that's far too vague to count as a direction to go do anything. Your Honor, that is very vague but that is not what happened here and that's not what the evidence shows. The directive from ISIS in this case was for supporters like the defendant and they targeted supporters as a critical component of their official governmental media operation. And they said, we need you supporters to go online and terrorize our enemies. That's the word that came out of Inside Eight and specifically told supporters if they close one account, open three. If they close three, open 30. And the defendant knew about that instruction. He quoted this video back to the online undercovers in the case. At one point he discusses with OCE2 that Telegram had shut down a number of accounts because they were ISIS related accounts and they were promoting terrorist content. And defendant says if they close one, we make two more. So is it fair, Ms. Wells, to say what while articulating the line for all purposes, all future cases around what direction and coordination is, is very difficult. Here, the nexus between the message that ISIS put out, the call and the defendant's response was very tight. Is that a fair takeaway in your view? That is 100% accurate, Your Honor. There was a very tight connection between what the FTO ISIS told supporters to do, defendant's specific evidence showing that defendant heard that, that he talked about it, that he quoted it back to others, that he sent screenshots of that video to other people. And then, of course, the action that he took in response to that was to create a computer program that did what ISIS was asking supporters to do, but it did it at scale. And then how about Mr. Herman makes a fair point that at all points in time, though, the defendant seems to take care to stay a step removed from ISIS. Your Honor, I think there's two points there. One, the government disagrees with that characterization of the evidence. Second, the jury heard that argument and rejected it to the extent that there were instances where the defendant did not follow through, say, on making a translation. That argument was made to the jury. There was also evidence that showed with regard to translations, for instance, defendant wanted to work with someone else who had more skills with Arabic. So there were reasonable inferences the jury could have drawn as to why that didn't happen. But what the evidence also showed is the defendant's persistent commitment to ISIS. He swore allegiance to the organization twice, which the Second Circuit has held is very good evidence of someone's formalization of their desire and intent to act at an FTO's direction. But that's not what he's convicted. I mean, swearing allegiance alone surely falls within the realm of speech and viewpoint. And I mean, it seems to me this all gets down to the code, because he finds all kinds of ways to stall and put off and not do quite a few other things that would have made your case much easier, whether it's, I don't know, just all kinds of activities. And it's just this code. And all the code does is replicate something from one place on Telegram to another. A few things there, Your Honor. The code does more than that. There were actually three different permutations of the code that defendants shared with other people. And as our expert testified, they sort of grew in sophistication. The code, one, he creates this computer program that could be used for neutral purposes. It doesn't have to be used for ISIS. He specifically wrote in his document that that was what he wanted it to be, that he wanted ISIS official media outlets to use it or to let him use it for them. But what that code did is it defeated spam filters. Those are technical limitations that Telegram had in place. And it used bots or automated sort of sub-programs to cycle through and evade that technical restriction that Telegram had in place. And then in the third and most sophisticated version of it that's written about in Heralds of the Internet, he adds a search function, which, as our expert testified, could be modified to do whatever the defendant wanted it to do. And then, of course, you have the Heralds of the Internet document itself, which is plainly on its face a teaching document that the defendant is sharing with people that he went out in the universe and found. This case is unusual in that these online undercovers didn't find the defendant. The defendant went out onto the internet and contacted one person he believed was working for a brand that ISIS used to translate its official media into English and another person that the defendant believed worked for an organization that distributed information about IEDs and explosives and toxins to would-be attackers. These are the people that the defendant found, that the defendant chose to share this information with. They weren't people who were bumping into the defendant at the government's request. Right, but it's the link to ISIS. How important is it that he watched the Inside 8 video? I mean, he could have just picked up from general online information sources the fact that there's this thing out there called ISIS and what its activities are and feel inspired and write this code and do all the rest of it. Do we have a proper case if ISIS didn't actually direct anything? He just volunteered, so to speak. If there was no evidence in the case that ISIS had directed anything or that the defendant had not seen this video, I don't know that the government would be here with this case, Your Honor. However, to use Judge Scudder's term, that video shows this very tight connection. It closes that gap and takes us out of this concern about what is the limit of direction and control that Judge St. Eve raised and into a factual sufficiency issue. And here, the jury heard these arguments. They rejected it. The judge heard the same evidence and on post-trial motions rejected it. He found that the directive from ISIS was, quote, very clear. He also looked at the defendant's actions and said, quote, there was nothing independent about what the defendant was doing. So there's nothing new that's been raised here on this appeal. We have three issues, two that are squarely decided by the Supreme Court. One, that services is not impermissibly vague. And two, that the first— But that was an as-applied. Yeah, the Supreme Court decided it as-applied in humanitarian law project. This is as-applied, not a general challenge to it. So I don't think we could say it's been resolved by the Supreme Court. They've certainly given a lot of guidance. Well, here, Your Honor— There are some services, in other words, that count. But you can't just call something a service and say, OK, we're done with that prong. Yeah, indeed. Isn't the proper reading of humanitarian law project—isn't the court saying we are rejecting a pre-enforcement challenge to 2339B? That is unequivocal in the opinion. But to be certain, the court emphasizes there can be very, very difficult cases under this statute. And what the lower federal courts, us included, need to do is to take those cases one at a time and be very careful about trying to draw lines for all purposes and take them one at a time. And indeed, at the end of the opinion, the Chief Justice, on behalf of a majority, says there's going to be cases that are problematic and the convictions are void, and there's going to be cases that fall on the permissible side of the line. So isn't it all as applied? Your Honor, the court certainly left open the possibility that there would be a case that required a court to revisit the standard that HLP set out. This case, in the government's view, is not that because it said that services—while that was also as applied—it said that services, the context in which it's used in the statute, confirms to the ordinary dictionary definition of services and that a person of ordinary intelligence would understand that services that are provided to an FTO or at their direction or in coordination with them would not be protected. But you still have to look at the different services at issue in the cases. That's the as applied part. Well, here, Your Honor, I think it's—I don't think it's a stretch to say that creating a computer program that you intend to direct to ISIS in defendants' own words—he wants ISIS to use it, he wants them to allow him to use it for them if they don't do it themselves—and that he is directing something that he described as being the only person in the world who could do that, something that could accomplish in mere minutes what otherwise would have taken hours to do. This was—time is running out. I have one more question for you, please. You aren't contesting that that creation of the computer program and dissemination of it is covered under the First Amendment, correct? No, Your Honor. Standing alone, of course, a person can write a computer program and that that is— But you're not contesting that's protected speech for purposes of this case? No, Your Honor. I don't think—I think that part of what the defendant did here was conduct, but we're not disputing that some element of this, certainly the teaching of it to others, excuse me, would constitute First Amendment conduct in the absence of what HLP says and limitations of the material support statute. Thank you. If there's nothing further, we ask that the Court affirm the conviction. Okay. Ms. Wells, thanks to you. Mr. Herman, give me the time that you reserved on rebuttal. Thank you, Judge. I had written a bunch of notes with HLP underscored to clarify some things, but I think you did my job for me. But just to highlight it, it was an as-applied challenge. Chief Justice Roberts went out of his way multiple times to say there may be future cases that are more difficult, and we submit that this is that case. What HLP also did, and we think HLP fully supports us rather than closes the space off for future challenges, is it emphasized the need to provide the services or more training and expert assistance in that case to the FTO. And one thing that Ms. Wells said, which I don't think is reflected in the record, is that Mr. Osiczynski was trying to get this program into the hands of ISIS, as opposed to carefully noting where the line was in communicating with non-FTO people. Didn't he make statements to that effect, though, that he wanted to get it to ISIS and they were going to use it? I thought in the recordings he made some of those type of statements. No, Your Honor. I don't think that's accurate, and I think also that the fact that he wouldn't even provide the screenshot to the CHS when the CHS said in, I believe it was October of 2019, if you give me the screenshot of the script, I will send it to the brothers in ISIS. And for two months he delayed on that. There was some debate back and forth about the use of the term brothers, and the brothers was not synonymous with ISIS when there was communication with non-FTO members. What about all this training of OCE4 that he seems to have undertaken, hours, how to use this code, copy ISIS videos? Judge, communications with a non-FTO member or non-FTO individual in an instance where that individual is not saying, I am acting on behalf of ISIS or I will give this to ISIS, you train me, I will train somebody in ISIS, is not the connection that HLP requires where the services are provided to the FTO. And we touch on this in the middle argument, the vagueness argument, which is that providing services to a non-FTO member when there's not a connection to a back-end FTO is a vague application of the statute. So you're basically saying, to go back to Judge Wood's initial question, that there's a problem here, there's a due process problem when the statute is trying to be applied through intermediaries of the designated organization. Not intermediaries of the designated organization, fellow supporters who are non-FTO members. None of these individuals portray themselves to be intermediaries, unlike the typical sting operations where we say, somebody's saying, I can help you travel to ISIS, I am an agent of ISIS. So you're saying the missing evidence is some evidence that ISIS delegated authority here to OCE4. If ISIS had said, we're using OCE4 and similar people to advance our mission in the world, and then OCE4 is trained by Mr. Osiedzinski, that would be enough to convict? That would be a more difficult case for us from a sufficiency standpoint, and it's precisely why on multiple occasions the government tactically made a decision to see if he would provide something to ISIS, the translations and the screenshots. Judge Scudder, you asked about the direction. In the government's brief, Insight 8 specifically says, support your Khalifa on the the watching Insight 8. He told one of the operatives, I started this because I couldn't find them online. This was an independent project with independent advocacy, and we would ask that the conviction be vacated. Okay, very well. Mr. Herman, many thanks to you. Ms. Wells, thanks to you and your colleagues in the government. We'll take the appeal under advisement.